**GREENBRIER CINEMAS, INC.,
Plaintiff,**

**v.**

**ATTORNEY GENERAL OF the UNITED
STATES et al., Defendants.**

**Civ. A. No. 77–0035.**

United States District Court,
W. D. Virginia,
Charlottesville Division.

Feb. 20, 1981.

Thomas A. Smart, New York City, Lewis A. Martin, Jr., Charlottesville, Va., for plaintiff.

Stephen F. Sonnett, Antitrust Div., U. S. Dept. of Justice, Washington, D. C., for defendants.

Lewis T. Booker, Hunton & Williams, Richmond, Va., for Buena Vista Distribution, Inc., et al., whom appeared as amici curiae.

### MEMORANDUM OPINION FINDINGS OF FACT, AND CONCLUSIONS OF LAW

TURK, Chief Judge.

## I. PROCEDURAL HISTORY OF THE CASE

On August 4, 1977, plaintiff filed this action seeking a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 1331(a) and 1337, that (a) the motion picture product allocation agreement, or "split," in which plaintiff participated between April 1975—April 1977 was not a violation of the federal antitrust laws, and (b) that the defendants' enforcement intentions with respect to "splits," as set forth in its April 1, 1977 press release, be declared without basis in law.

In response to defendants' motion to dismiss under F.R.Civ.P. 12(b)(1), dated October 7, 1977, this court found in its January 17, 1978 Opinion and Order that plaintiff's action arose under Section 1 of the Sher-

man Act, 15 U.S.C. § 1 *et seq.*, and that it was ripe and appropriate for judicial review. Defendants filed their answer on February 10, 1978, denying the essential allegations of plaintiff's complaint. On May 5, 1980, just before trial, plaintiff amended its complaint, with the defendants' and the court's consent, to seek a declaratory judgment only as to whether or not the split in which it participated was a *per se* violation of the Sherman Act. Trial was thus limited to the issue of what the split agreement was, how it operated, and whether the agreement did constitute a *per se* violation of the Act regardless of any effect it might or might not have had on competition or price.

The parties stipulated that plaintiff's business has been and continues to be in the flow of, and substantially affects, interstate commerce in motion pictures and in theatre equipment utilized for the exhibition of motion pictures.

### The Parties

Plaintiff, Greenbrier Cinemas, Inc. operated a two screen, indoor, first-run motion picture theatre in Albemarle County, just outside the city limits of Charlottesville, Virginia from June 1974 until February 19, 1980 when Greenbrier Cinemas was purchased by Greenbrier Theatres, Inc.[1]

Defendants are the Attorney General, the Honorable William French Smith, the Assistant Attorney General in charge of the Antitrust Division, and the United States Department of Justice, the governmental agency responsible through its officers for enforcement of the antitrust laws.[2]

Exhibitors other than plaintiff Greenbrier operating in Charlottesville during the "split" period include the Terrace Theatre I and II, a two-screen, first run indoor theatre operated by ABC Southeastern Theatres, Inc. (ABC).[3] The Barracks Road Theatre and the University Theatre, each a single-screen, first run indoor theatre operated by Neighborhood Theatres, Inc. (Neighborhood); and the Ridge Drive-In, a single-screen outdoor theatre operated by Neighborhood from before 1970 until 1979 when it closed.

The Vinegar Hill Theatre, a single-screen, indoor theatre specializing in repertory, art, and foreign films in operation since February 1976 is owned and operated by Ann Gordon and F. Guthrie Gordon, III.[4]

Motion pictures are provided to exhibitors by motion picture distributors. The major distributors collectively licensing a substan-

1. On March 5, 1980, Greenbrier Cinemas and Greenbrier Theatres, moved to join Greenbrier Theatres as an additional party plaintiff because the latter had succeeded to the business and interest of the former. Although the government initially opposed the joinder of Greenbrier Theatres as an additional party plaintiff, the government at trial abandoned its opposition to joinder and stipulated to the joinder of Greenbrier Cinemas and Greenbrier Theatres as plaintiffs.

2. Honorable Griffin B. Bell was the Attorney General and Honorable John H. Shennefield was the Assistant Attorney General in charge of the Antitrust Division when this suit was filed. However, pursuant to Rule 25(d), Fed.R. Civ.P., Messrs. Civiletti and Litvak automatically became defendants herein upon succeeding Messrs. Bell and Shennefield in their respective offices. The Honorable William French Smith has since succeeded Mr. Civiletti, and Mr. Litvak has resigned with his successor yet to be appointed.

3. In October 1978 Plitt Southern Theatres, Inc. purchased "ABC", and presently operates the Terrace.

4. Ann Gordon, general partner in the Vinegar Hill Theatre Limited Partnership petitioned to intervene on this action pursuant to F.R.Civ.P. 24(a) and 24(b) on the grounds that it requested but was never permitted to participate in the split of product during the time the split was in existence, and that the refusal had been injurious to its business. Petitioner requested that any relief granted plaintiff Greenbrier require notice to Vinegar Hill of meetings of the product split, a court-enforced right to participate in the split, the right to fair treatment in obtaining exclusive rights to deal with film distributors and the right to preferential treatment to make up for past exclusion from the split. The court denied the motion to intervene and Vinegar subsequently submitted its brief as *amicus curiae* requesting that the defendants' position be sustained or in the alternative, that if product splitting be permitted, it be done in a manner designed to protect all competitors and not just the former split members.

tial number of motion pictures to Charlottesville exhibitors during the split period include: Buena Vista Distribution Co., Inc.; Columbia Pictures Industries, Inc.; Metro-Goldwyn-Mayer, Inc.;[5] Paramount Pictures Corp.; Twentieth Century-Fox Film Corp.; United Artists Corp.; Universal Film Exchanges, Inc.; and Warner Bros. Distributing Corporation.[6]

Although the exhibitors in Charlottesville, Virginia have obtained and continue to obtain motion pictures from all the motion picture distributors, the most prominent minor motion picture distribution companies are Allied Artists Pictures Corp.; American International Pictures; and Avco-Embassy Picture Corp.

## II. FACTUAL HISTORY OF THE CHARLOTTESVILLE SPLIT

Plaintiff, Greenbrier has operated a motion picture theatre in Charlottesville, Virginia since 1974. From 1975 through April, 1977, Greenbrier and two other motion picture exhibitors that operate theatres in Charlottesville participated in what is known as a "split". Participants in a split agree and allocate among themselves the initial opportunity for only one member to negotiate and conclude a license agreement for a particular film with that film's distributor. The complaint alleges that distributors were aware of and acquiesced in the split arrangement, and that distributors had the power to force a termination of the split if they desired.

Split arrangements have been widely used in the motion picture industry, especially since the case of United States v.

*Paramount Pictures, Inc.*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948) resulted in extensive structural changes in the motion picture exhibition industry. Plaintiff alleges that it entered into the split with the belief that the Justice Department Antitrust Division had publicly taken the position that splits were legal when practiced with the acquiescence of the distributors whose films were allocated.

On April 1, 1977, the Department of Justice issued a press release. The release was an announcement by then Attorney General Bell that the Department "believes that the use of 'split' agreements by motion picture exhibitors violates the antitrust laws and that continuation of this practice will subject participants to appropriate legal action by the Department's Antitrust Division." The press release also stated that Assistant Attorney General in charge of the Antitrust Division, Donald I. Baker, considered split agreements to be a *per se* violation of the Sherman Act, 15 U.S.C. § 1, and that exhibitors and other participants engaging in a split arrangement after the date of the press release would be subjected to prosecution.

On April 4, 1977, the President of National Association of Theatre Owners, Inc. sent a telegram to Mr. Baker requesting that any initial action by the department against "split" members be solely for equitable relief, rather than criminal prosecution.[7] The Assistant Attorney General's response dated April 28, 1977, stated that "it is our present enforcement intention that the initial case or cases that we may bring against 'split' agreements will be civil cases seeking equitable relief. However, if we discovered

---

5. Metro-Goldwyn-Mayer, Inc. has distributed its motion pictures through United Artists Corporation since 1974.

6. The court by order dated June 23, 1980 permitted the following motion picture distributors to file a consolidated brief *amicus curiae* in this action: Avco Embassy Pictures Corp., Buena Vista Distribution Co., Inc., Columbia Pictures Industries, Inc., Filmways Pictures, Inc., Paramount Pictures Corporation, Twentieth Century-Fox Film Corporation, United Artists Corporation, the Universal Film Exchanges, Inc. and Warner Bros. Distributing Corporation. Coun-

sel for the *Amici* participated in oral argument on October 31, 1980 before this court. Their brief in sum asked that the court disallow the Charlottesville exhibitors from entering into split agreements.

7. The Attorney General is empowered to seek equitable relief pursuant to 15 U.S.C. § 4, or to prosecute criminally. Violation of 15 U.S.C. § 1 is a felony punishable by a fine not to exceed one million dollars for a corporation, or imprisonment not to exceed three years, or both; 15 U.S.C. § 1 as amended.

a 'split' agreement which involved clearly predatory or coercive conduct, we might well proceed criminally there because of the special nature of such conduct."

This suit stems from the fact that plaintiff and the other members of the split have ceased to participate in the split agreement. Plaintiff alleges that there has been no split of product in Charlottesville since April 1, 1977 and that the termination of the split has had and will continue to have a detrimental effect on its business.

### III. METHODS OF MOTION PICTURE DISTRIBUTION WITHIN THE FILM INDUSTRY

The evidence in this case discloses that the distributors in several respects followed a general pattern in the distribution of feature films for first run exhibition prior to and often instead of the split type agreement. It is necessary to lay a foundation of film industry procedures in order to better understand the instant case.

Motion pictures are usually licensed, not sold, on a competitive basis by distribution companies. Exhibitors ordinarily acquire the right to show motion pictures under written license agreements which cover specified terms including the theatre and screen, film rental, any advances or guarantees, opening date, length of the run, and any holdover terms. Film rental is ordinarily based on a percentage of the box office gross receipts with the distributor customarily receiving a larger percentage of the grosses in the early weeks of the run and a declining percentage in later weeks.

Ordinarily, the national sales manager or his equivalent for each distributor establishes uniform "national terms" for the first run of each picture in each type of market throughout the United States. The distributor's branch manager obtains these national terms from a suitable theatre in each market within his territory. Some distributors have established the policy of making "adjustments" to reduce license fees if it so happens that the national terms were set with the expectation that the particular picture would be more successful than it

turned out to be, and the exhibitors who played the picture will suffer losses if the terms are not adjusted to reduce the license fees actually paid. Adjustments are strictly discretionary with the distributor however, they are never given solely for selected individual markets such as Charlottesville, but are given uniformly throughout the country on a particular picture.

Historically, three principal methods have been utilized by the distributors for licensing motion pictures. One method is bidding in which the distributors send out written bid invitations to exhibitors, specifying the picture, its availability date, general information regarding its subject matter, the terms which the distributor will accept (national terms), advances or guarantees being sought, and the length of run the distributor seeks. In bid situations, distributors reserve the right to either accept or reject all bids should none of them be acceptable.

The second method of licensing films is negotiation—from the outset or after a bid invitation is sent out and no offers or unacceptable offers are received. When a film is licensed by negotiation, the distributor's branch manager contacts the theatre or theatres in which he desires to place the pictures and notifies them of the national terms established for that picture. If a selected theatre agrees to pay the national terms, a license agreement is concluded. If not, the branch manager will negotiate with other exhibitors even though they may have less desirable theatres for the particular picture involved.

The third method used by some distributors in licensing motion pictures at various times is to select a particular theatre or chain in a given market and license all its pictures to that theatre or chain without ever contacting the other theatres in the market involved. With this third method, the distributor deals with only a single exhibitor in each market and there is no competition among exhibitors to obtain its product. This lack of competition also prevails under the negotiations method if the distribution first approaches only a preferred exhibitor for a particular picture and

licenses the picture to that exhibitor if it agrees to the national terms.

In bidding situations, distributors' terms regarding the opening date and length of run specified in the license agreement that is ultimately executed, are firm and not subject to change. Under the bid system, distributors have consistently taken the position that a film must run for the full period specified in the license regardless of its unpopularity at the box office. In contrast, under the other two systems there is greater flexibility to move pictures on and off the screen in response to the public's reaction to a specific film.

Until April 1, 1977, when the Department of Justice issued its April press release disallowing splits, splits were in effect in many markets throughout the United States. The Department acknowledged in the press release that splits "have been widely used by motion picture exhibitors for decades" and have become "prevalent." The terms and circumstances of split arrangements varied widely from market to market and within the same market at different times. However the only arrangement at issue in this case is the "Charlottesville Split" and the court has chosen only to address itself to the conditions existing in the Charlottesville market at the time of that split.

## IV. AUTHORITY

■ The thrust of the Justice Department's position in this case is that the Charlottesville Split is *per se* illegal. Such a determination regarding splits implies that certain types of business agreements are considered anti-competitive and injurious to the public without any need to determine if the agreement has actually injured market competition or violated antitrust laws. Section 1 of the Sherman Act bars any contract, combination or conspiracy "in restraint of trade." Were the statute to be read literally, any commercial contract could be deemed to violate it. *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). Congress, however, did not intend to prohibit all contracts, nor even all con-

tracts that might in some degree restrain trade or competition. The Supreme Court thus concluded that the Act precludes only agreements that are "unreasonably restrictive of competitive conditions." *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 58, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911). The court adopted the "rule of reason" as the prevailing standard of analysis for determining whether business practices violate the Sherman Act. *Continental T. V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977).

■ A determination of the reasonableness of particular restraints requires consideration of the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, the history of the restraint and the reasons for its adoption. *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).

■ Although the rule of reason is used to evaluate the validity of most activity challenged under the Sherman Act, the doctrine of *per se* illegality has been applied to a limited category of restraints that are so clearly and manifestly anti-competitive that no useful purpose would be served by analyzing the conduct under the rule of reason. The courts have been reluctant to add a new category to those already recognized as *per se* unreasonable.

In *United States v. Topco*, 405 U.S. 596, 607–608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972), the Supreme Court cautioned that "it is only after considerable experience with certain business relationships that courts classify them as per se violations of the Sherman Act." This hesitancy is reflected in the fact that the court has not added any new *per se* categories of violation since 1972. The court in *Continental T. V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) emphasized that "departure from the rule of reason standard must be based upon demonstrable economic effect rather than—as in Schwinn—upon formalistic line drawing."

*Id.* at 58–59, 97 S.Ct. at 2561–2562. The court in *United States v. Arnold Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967) held certain restraints between manufacturers and distributors of the manufacturer's goods as *per se* unlawful. The court, in *Continental*, however, overturned the *Schwinn* decision.

The Supreme Court's most recent decision on the *per se* rule is closely on point to the facts of this case and makes it apparent that new categories of *per se* illegality are to be eschewed. In *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) ("ASCAP") the court held that the blanket licensing system employed by defendants for licensing copyrighted music was not *per se* illegal.

Defendants in ASCAP were two copyright clearing houses, the American Society of Composers, Authors, and Publishers ("ASCAP") and Broadcast Music, Inc. ("BMI"), which between them hold non-exclusive rights from their members to almost every domestic copyright composition. Both organizations issue licenses, collect royalties and distribute them to copyright owners. At issue was their system of blanket licensing, which gives the licensees the right to perform any and all of the compositions owned by the members as often as the licensees desire, for a flat fee, the amount of which does not directly depend upon the amount or type of music used. The blanket licensing system in *ASCAP* was designed, as the plaintiff alleged in this case, to provide a more flexible, practicable and efficient method of licensing copyrighted music than negotiations between each individual copyright owner and each user. Use of a blanket license eliminated price competition between copyright owners since they had joined together into an organization that set a package price and did not compete in licensing their individual copyrights. Although the rights given to *ASCAP* by its members were non-exclusive and the users were free to attempt to negotiate with individual copyright owners, plaintiff CBS had never attempted to do so. Greenbrier contends that in the Charlottesville Split, distributors were free to solicit competitive

offers if they did not wish to accept the offer from the theatre to which their product had been split. Greenbrier further contends that the distributors periodically availed themselves of this opportunity in this case.

The Supreme Court in *ASCAP*, noting that "easy labels do not always supply ready answers," refused to apply the price fixing label to the blanket license at issue, and instead stated that the proper inquiry on the *per se* issue is "whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output, and in what portion of the market, or instead [whether it is] one designed a 'increase economic efficiency and render markets more, rather than less, competitive.'" 441 U.S. at 19–20, 99 S.Ct. at 1562–1563. The court held that the practice was not *per se* illegal, since it increased market efficiency.

"The blanket license, as we see it, is not a 'naked restraint of trade with no purpose except stifling of competition,' *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963), but rather accompanies the integration of sales, monitoring, and enforcement against unauthorized copyright use." 441 U.S. at 20, 99 S.Ct. at 1563.

Despite the fact that several courts had found blanket licenses to be violative of the Sherman Act, the court noted that there was no "universal view" that they were *per se* illegal. 441 U.S. at 16, 99 S.Ct. at 1560. Plaintiff Greenbrier similarly alleges that there is no universal view of *per se*, illegality regarding splits. The Fifth Circuit noted recently in *Northwest Power Products, Inc. v. Omark Industries*, 576 F.2d 83, 86 (5th Cir., 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979) that the "usual assumption is that a *per se* rule would grow out of a history of rule of reason cases all arriving at the same verdict."

The Justice Department has for over 25 years been actively involved in supervising competitive aspects of the motion picture

industry. The government has monitored the motion picture industry on an ongoing basis to determine compliance with the Supreme Court's decree in *United States v. Paramount*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948) which substantially altered the structure of the industry including provisions governing the licensing and exhibition of films.

The court in *ASCAP* similarly concluded its analysis of blanket licensing by noting its previous widespread use and acceptance:

> With this background in mind, which plainly enough indicates that over the years, and in the face of available alternatives, the blanket licensing system provided an acceptable mechanism for at least a large part of the market for the performing rights to copyright musical compositions, we cannot agree that it should automatically be declared illegal in all of its many manifestations. Rather, when attacked, it should be subjected to a more discriminating examination under the rule of reason. 441 U.S. at 24, 99 S.Ct. at 1565.

In light of these competing considerations, the court held that the legality of the blanket license system should be analyzed under the rule of reason and was not a *per se* violation. Greenbrier contends that this logic applies with equal force in the case of splits. In sum, the Supreme Court has made clear that a particular practice such as the Charlottesville Split should not be adjudged a *per se* violation of the Sherman Act unless:

(1) It has a "pernicious effect on competition and lack of any redeeming virtue," *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958);

(2) The courts have had "considerable experience" in analyzing this particular business relationship, *United States v. Topco Associates*, 405 U.S. 596 at 607–608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972).

(3) This "considerable experience" has led to the "nearly universal view" that the practice has no "redeeming virtue" and is

illegal, *ASCAP*, 441 U.S. 1, 16, 99 S.Ct. at 1560;

(4) The practice is a "naked restraint of trade with no purpose except stifling of competition," *White Motor Co. v. United States*, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); and

(5) The challenged practice may have no redeeming competitive virtues and that "the search for these virtues is almost sure to be in vain," *ASCAP, supra*, 441 U.S. at 13, 99 S.Ct. at 1559.

It is now necessary for the court to assimilate the facts of this case and apply the factors developed over a period of years to ascertain the existence or non-existence of *per se* illegality under the Sherman Act. No hard and fast rule exists which governs that determination; this court should cautiously apply the previous judgments above enumerated as a guideline with which to temper judgments on the lawfulness of the Charlottesville Split.

## V. FINDINGS OF FACT

In light of the court's previous summary of the events in the instant case and an analysis of the motion picture industry as it pertains to the present situation, the court now makes the following findings of fact and conclusions of law.

The court finds that:

1. The split of motion picture product was in operation in Charlottesville, Virginia from April 8, 1975 to April 1, 1977. During the existence of the Charlottesville Split the following motion picture theatres were operating in the Charlottesville market:

a. Owned by Robert Stroh and his partners:

1. Greenbrier Cinemas (two screens, with capacities of 323 and 238, respectively);

2. Cinema Theatre (one screen, 525 capacity);

b. Owned by the Neighborhood Group of Motion Picture Theaters:

1. Barracks Road Theatre (one screen, 814 capacity);

2. University Theatre (one screen, 712 capacity);

3. Ridge Drive-In (one screen, 520 car capacity);

c. Owned by Ann Gordon and F. Guthrie Gordon, III:

1. Vinegar Hill Theatre (one screen, 254 capacity).

d. Owned by ABC Southeastern Theatres, Inc.:

1. Terrace Theatre I and II (two screens, with capacities of 400 and 600 respectively).

2. During the existence of the Charlottesville Split, seven major distribution companies and a number of independent distribution companies licensed motion pictures for exhibition in Charlottesville.

3. The seven major distribution companies were: Buena Vista Distribution Co., Inc., which distributed Walt Disney pictures; Columbia Picture Industries, Inc.; Paramount Pictures Corporation; Twentieth Century Fox Film Corp.; United Artists Corporation, which in addition to distributing its own product also distributed pictures for Metro-Goldwyn-Mayer, Inc.; Universal Exchanges, Inc.; and Warner Brothers Distributing Corp.

4. The independent distribution companies that licensed pictures for exhibition in Charlottesville during this period included Allied Artists Pictures Corp.; American International Pictures; and Avco-Embassy Pictures Corp.

5. In 1977 the seven major distribution companies received 92% of all film rental paid distributors by exhibitors in the United States and accounted for over 90% of box office grosses in Charlottesville. During the operation of the Charlottesville Split, motion picture distribution in the United States was a highly concentrated industry.

6. During the split period, there were about 15 large motion picture exhibition chains in the United States, approximately 300 circuits composed of five or more theaters, and a number of firms which owned and operated as few as one or two theaters.

7. There was a serious shortage of quality film product in the motion picture industry during the Charlottesville Split. Because of the shortage of film product and because motion picture distribution was a concentrated industry, the exhibitors had the weaker bargaining position vis-a-vis each of the distributors.

The court further finds that:

8. The Charlottesville exhibitors entered into the split agreement on April 8, 1975 at a meeting held in Charlotte, North Carolina.

9. In attendance at the April 8, 1975 meeting were R. T. Belcher and Steve Smith representing Greenbrier; Sam Bendheim representing Neighborhood; and John Huff and Don Gattis representing ABC.

10. The exhibitors entered into the split agreement with the belief that it was lawful to do so as long as they did not preclude any distributor from negotiating with any exhibitor he desired.

11. The exhibitors openly entered into and carried out the split without attempting to conceal it in any way and with the full knowledge of the distributors to the substance of the split agreement.

12. The split agreement entered into by the Charlottesville exhibitors had the following terms:

a. Each exhibitor would be assigned certain pictures of both major and independent distributors for which that exhibitor would have the initial opportunity to negotiate a license agreement with the distributor.

b. The exhibitors would then present their suggested allocation of product to the distributors for the distributors' consent.

c. There was no agreement among the exhibitors that they would require a distributor to deal only with one exhibitor assigned its picture.

d. Any distributor that did not want to license a picture to the exhibitor assigned that picture was free to negotiate with any other exhibitor.

e. Any distributor that was not satisfied with the license terms offered by the first exhibitor who had been assigned the

picture was free to negotiate with any other exhibitor.

f. The distributor, if he so desired, was free to negotiate simultaneously with more than one exhibitor.

g. Each exhibitor was free to negotiate with any distributor for any picture if the distributor desired to negotiate with that exhibitor.

13. The split agreement was limited to assigning motion pictures to the exhibitors for initial negotiation.

14. Subsequent to the first split meeting on April 8, 1975, the exhibitors held seven other split meetings, approximately one every three or four months.

15. At the first meeting in April 1975 and the second meeting in July 1975, the pictures were assigned by theatre or screen and play date. At the six subsequent meetings, the pictures were split into three groups of approximately equal grossing potential which were then assigned by lot to all exhibitors.

16. The first and second split meetings were transition meetings into the split in that the exhibitors had already scheduled a number of pictures for particular playdates prior to the beginning of the split. The scheduling of pictures by theatre or screen and playdate at these first two meetings was to fill in the scheduling gaps created by the prior bookings.

17. The exhibitors were not obligated under the split agreement to play the pictures as they were scheduled by theatre or screen or playdate at the first and second split meetings.

18. Mr. Bendheim testified that the majority of the pictures split at the first two meetings played on different dates or at different theatres or screens than those initially decided upon at those meetings.

19. Mr. Bendheim also testified that some pictures were split by letter by the exhibitors in between split meetings. These pictures included available pictures that had not been assigned at the split meetings and pictures that were scheduled for release only after a split meeting had occurred.

The court further finds that:

20. Sometimes, after the pictures were assigned to each exhibitor at a split meeting, the split members would trade pictures. The trades usually took place at the split meeting or within a few days afterward, and before negotiations began with the distributors.

21. The reasons for the exhibitors making trades were:

a. The personal preference by an exhibitor for a particular picture on a split list not drawn by that exhibitor at a split meeting.

b. To accommodate distributors who did not want certain types of pictures played in certain theatres or who did not want to negotiate with certain exhibitors at a particular time.

c. That in the event the exhibitor assigned a picture did not have free screen time on the dates that the distributor desired the pictures to play in Charlottesville, the exhibitor assigned the picture would trade it to another exhibitor who could play the picture on the playdates desired by the distributors.

22. Messrs. Bendheim, Huff and Belcher testified that it was not a requirement or understanding of the split agreement that when one exhibitor licensed a picture split to someone else that he had to trade a picture in return. In those instances where exhibitors did license pictures not assigned to them, in some cases there were trades and in other cases there were no trades.

23. The substance of the split agreement among the exhibitors was communicated to and known by the distributors' branch managers.

24. Anytime a distributor branch manager was unhappy with the theatre to which his picture was assigned or the license terms offered by the exhibitor to which his picture was assigned, he was free to negotiate with other exhibitors and to shop around to obtain the best possible license terms.

25. In every instance testified to at trial where a distributor objected to either the theatre to which its pictures had been assigned or to the license terms offered by the exhibitor initially assigned the picture, the distributor was able to license its picture to a theatre and at license terms that it found satisfactory.

### *Distributor Knowledge of or Acquiescence in and Consent to the Charlottesville Split*

The court further finds that:

26. Each distributor represented to the court that during the split period it was not required at any time to negotiate with any exhibitors that it did not want to and was able to successfully negotiate with exhibitors other than the one assigned its pictures on the split when it wanted to.

a. Buena Vista did not want its pictures played at the Greenbrier Cinema and preferred to have its pictures played at Neighborhood's Barracks Road Theatre.

1. Buena Vista's Eastern Division Manager Anthony Lomonaco testified that early on during the split period, he advised Buena Vista's branch manager Harry Howar that he did not want Buena Vista pictures played at the Greenbrier and that Howar should either obtain a guarantee from Greenbrier or seek to license the picture to a larger, more acceptable theatre in Charlottesville. Howar then successfully negotiated a license agreement on the picture in question with the Barracks Road Theatre, which had not been split the picture and which was both an acceptable and preferable theatre to Buena Vista.

2. When a Buena Vista picture assigned at a split meeting was in a lot drawn by Greenbrier, the picture would be reassigned or traded to Neighborhood Theatres.

3. Examples of Buena Vista films assigned at a split meeting to Greenbrier but later reassigned to Neighborhood include Treasure of Matecumbe, Freaky Friday, and the Rescuers which all later played at the Barracks Road Theatre.

4. Disney's True Life Adventures and Ride a Wild Pony were the only Buena Vista films to play at the Greenbrier during the split period. Buena Vista was satisfied with the theatre and license terms obtained on both of these films. Mr. Lomonaco testified that these were inferior pictures which were anticipated by Buena Vista to have a lesser grossing potential and in fact did not gross well.

5. The only instance in which Buena Vista had any question concerning whether a picture played on satisfactory playdates was the Shaggy D.A., a picture which did not play Charlottesville at the Christmas playdates desired by Buena Vista. There is no evidence that the Shaggy D.A. would have played in Charlottesville during Christmas absent the split or that the split in any way affected the movie's playdates. The court finds that it was not unusual for a distributor to be unable to exhibit a picture on its desired Christmas playdates because there would be more pictures in release on those popular playdates than screens available, especially in a small community like Charlottesville with a limited number of exhibition screens.

6. There is no evidence of a single instance during the split period where Buena Vista because of the split was precluded from obtaining better license terms.

b. Paramount was able to resolve to its satisfaction any objection it ever had during the split period concerning a particular picture it distributed.

1. Charlotte's Web was a film distributed by Paramount.

2. ABC initially contacted Paramount to negotiate a license to exhibit Charlotte's Web at the Terrace Theatre. However, Paramount's branch manager, George Kelly, felt that Charlotte's Web, as a "Disney-type picture," was better suited to play the Barracks Road Theatre. The exhibitors followed Mr. Kelly's advice and Charlotte's Web played at the Barracks Road Theatre.

3. King Kong, also distributed by Paramount, was scheduled for national release at Christmas 1976. However, in August 1976, four months prior to its desired release, Paramount was concerned that King Kong was not yet licensed in Charlottesville and was anxious to get it a date.

4. On August 11, 1976, Kelly sent a telegram to Greenbrier, Neighborhood and ABC stating that Paramount had "been precluded from licensing [King Kong] in Charlottesville, Va. because of a illegal product agreement among certain exhibitors. We must advise you that Paramount does not acquiesce in, or give its consent to, any such product agreement. We shall attempt to license each of our pictures to the theatre which we believe is appropriate for its exhibition."

5. The court finds that the purpose of the telegram was not to object to the split, but to pressure the exhibitors into splitting King Kong so Mr. Kelly could receive a date for the picture.

6. During an August split meeting shortly after the August 11, 1976 telegram, King Kong was assigned to Greenbrier.

7. Kelly negotiated with Greenbrier for license terms on King Kong but was unable to reach an agreement with Greenbrier.

8. While negotiating with Greenbrier in an attempt to reach agreement on license terms for King Kong, Kelly was simultaneously negotiating with Neighborhood to obtain better license terms.

9. Although Neighborhood had not been split, King Kong, Kelly reached agreement with Neighborhood to exhibit the film and King Kong was in fact exhibited by Neighborhood during the Christmas playdates desired by Paramount in its national release schedule.

10. Marathon Man was another picture distributed by Paramount which, although not yet licensed in Charlottesville as of August, 1976, was still scheduled for national release at Christmas 1976.

11. In the same August 11, 1976 telegram concerning King Kong, Kelly stated that Paramount had "been precluded from licensing [Marathon Man] in Charlottesville, Va. because of an illegal product agreement among certain exhibitors."

12. Shortly after the August 11, 1976 telegram, Marathon Man was assigned to ABC at the August 1976 split meeting, and Kelly subsequently reached agreement with ABC for Marathon Man to be exhibited at the Terrace Theatre.

13. Marathon Man did in fact play at the Terrace Theatre on the Christmas playdates desired by Paramount in its national press release schedule.

14. On March 18, 1977, Kelly sent a telegram to Greenbrier, Neighborhood, and ABC stating that Paramount "has been precluded from licensing certain of its pictures in Charlottesville, Va., because of an illegal product agreement among certain exhibitors. We must advise you that Paramount does not acquiesce in, or give its consent to, any such product agreement. We shall attempt to license each of our pictures to the theatre which we believe is appropriate for its exhibition."

15. The court again finds that the purpose of this telegram was not to object to the split, but to pressure the exhibitors into more quickly dating Paramount's pictures. This time, those that were scheduled for summer 1977 release.

16. Mr. Kelly, in his sworn deposition recollected that all of Paramount's pictures scheduled for summer 1977 release, played in Charlottesville and there were no problems with any of them.

17. Thus, there is no evidence of a single instance where Paramount was precluded from obtaining better license terms because of the split.

18. During the split period, United Artists' branch manager, Seymour Berman "succeeded in licensing United Artists' product to the theatres in Charlottesville which [he] believed most suitable for the films involved and thus most conducive to producing the greatest revenue for United Artists in Charlottesville."

The court finds that after a thorough examination of the record in this case concerning United Artists, Columbia, Twentieth Century Fox, and Universal, that:

27. There is no evidence of a single instance during the split where any of these four film distributors were precluded from negotiating with any exhibitor it desired.

a. There is no evidence of a single instance during the split period where any of these four film distributors had to exhibit a picture in a theatre unacceptable to it.

b. There is no evidence of a single instance during the split where any of these four film distributors were precluded from obtaining better license terms because of the split.

c. Warner Brothers' branch manager Charles Jordan testified, in general, that he felt unable to negotiate with exhibitors other than the one assigned his picture because the other exhibitors had already scheduled pictures for the dates in which he was interested by the time he wanted to negotiate with them.

The court finds Mr. Jordan's testimony contradictory and remarkable in light of the fact that:

1. Mr. Jordan could not cite a single instance in which he was precluded from negotiating with exhibitors in the manner that he states.

2. Mr. Jordan admitted that he never stated to any Charlottesville exhibitor that Warner objected to or did not acquiesce in or consent to the split.

3. However, Jordan testified that he made his objection to the split clear to the Charlottesville exhibitors by the connotations in and intonations of his voice.

4. Since Jordan admitted on cross-examination that he was a personal friend of the bookers and buyers representing the Charlottesville exhibitors, had eaten in their homes and knew their families, the court is indisposed to accept that Jordan would relay his apparent displeasure with the split agreement merely by voice connotations and intonations.

5. Jordan testified that he did not encourage or acquiesce in or consent to the split. This testimony contradicts that testimony in which Belcher states that Jordan encouraged him to form the split and to insist on an equal sharing of product by Neighborhood and ABC.

6. The court finds that Jordan never stated or implied in any way that Warner objected to the split or did not acquiesce in or consent to the split.

d. During the split period, independent distributors were able to play all of their pictures in Charlottesville irrespective of the fact that all their pictures may not initially have been split to an exhibitor. Furthermore, during the split period, independent distributors were not precluded from negotiating with any exhibitor they desired nor does the record indicate any independent distributors' opposition to the split agreement.

e. The court now finds that although all of the distributor branch managers were apprised of the existence and content of the split agreement from the outset of the Charlottesville Split, none of them ever communicated to any Charlottesville exhibitor either orally or in writing, that:

1. He or his distribution company objected to the split.

2. He or his distribution company wanted the split stopped.

3. He or his distribution company demanded its pictures be licensed by bidding; or

4. Threatened to sue the Charlottesville exhibitors to stop the split; except for the following five standard language form letters and telegrams:

(a) In the second paragraph of a form letter agreeing to stop bidding, Columbia stated "if, as it appears, there is an arrangement between exhibitors to allocate pictures in this situation, please be advised that our company does not recognize such arrangements and will not participate in them. We will attempt to license each of our pictures in the manner we believe is most appropriate for its exhibition."

(b) In the third paragraph of its standard form language agreeing to stop bidding, Paramount stated "we must advise you, however that Paramount does not acquiesce in, or give consent, to any product agreement, if such a plan is contemplated. We shall attempt to license each of our pictures to the theatres which we believe is appropriate for its exhibition."

(c) During the split period, Paramount also sent to the Charlottesville exhibitors two telegrams containing the same language as the form letter, *supra*, Findings of Fact 26b(4) and (14). The court finds that these telegrams were sent to get split members to split or date Paramount's product more expeditiously;

(d) Buena Vista sent two standard form language letters drafted by Buena Vista's legal department to protect its legal position, to exhibitors. The letters in which Buena Vista agreed to discontinue bidding stated that it "will not become a party to, expressly or impliedly consent to, or acquiesce, in any agreement, arrangement or understanding for the splitting of our product in any area." ". . . we will license our pictures in both bidding and non-bidding situations to that theatre which, in our best business judgment, will return to us the most film rental on the basis of the offer which it makes. We welcome offers from all qualified theatres."

The court further finds that:

4. None of the Charlottesville exhibitors was directly told by or understood from the written or oral communications, or actions, of a distributor that any distributor:

(a) objected to the split; or

(b) wanted the split stopped; or

(c) demanded its pictures be licensed by bidding; or

(d) threatened to sue the Charlottesville exhibitors to stop the split.

5. The record indicates that all the distributors knew from the outset that the April 1975 letters and telegrams they received from the Charlottesville exhibitors requesting that bidding be discontinued, meant that a split was starting, each distributor agreed to end bidding and begin negotiating in response to the exhibitors' request that it do so.

28. Regardless of the interest and desires of any party concerned in this case, be they exhibitor or distributor, after the issuance of the April 1977 press release by the United States Department of Justice, and as a direct result of the press release, the exhibitors terminated the Charlottesville Split and no further splitting has since taken place in Charlottesville.

## VI.  CONCLUSIONS OF LAW

When this case began the parties agreed that the only issue to be presented to the court was whether or not the split of film product in Charlottesville was *per se* illegal. The parties stipulated that there would be no evidence and no finding on the purpose or the effect of the split, only what the split agreement was and how it operated in Charlottesville. The rationale behind the parties stipulation was that all parties concerned wanted the court to decide the validity of the government's press release. Theoretically, the press release said that in a "split" situation, the facts, the purpose and the effect of the split were unimportant. Once the existence of a split has been determined, it is automatically illegal under the *per se* rule. The court this day chooses only to decide the application of that press release to the Greenbrier case.

The fact that the Charlottesville exhibitors entered into an agreement with respect to the manner in which they would allocate motion pictures is not in issue; it has been admitted. For that agreement to fall within the *per se* category, it needs to be shown that the competitive restraints which it imposed were similar to as equally restrictive or more severe than those types of competitive restraints which have previously been identified as *per se* illegal. The United States Supreme Court has over the years formulated criteria with which to determine

the gravity of restraints in interface with the Sherman Act.

This court does not wish the decision in this case to be a suspension of past caselaw, but a well-reasoned continuation of judgments reached defining the legal boundaries of activities in play under the antitrust laws. Therefore, in light of the findings of fact, perhaps too laboriously presented and enumerated above, and after a thorough review of the intracacies of the now infamous Charlottesville Split, this court is not disposed to conclude that:

1. The split has had a "pernicious effect on competition and lack of any redeeming social virtue." *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); or

2. The courts are inexperienced in analyzing this particular business relationship, *United States v. Topco Associates*, 405 U.S. 596, 607–08, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972); or

3. The "considerable experience" which the courts have in dealing with this particular business relationship has led to the "nearly universal view" that this practice has no "redeeming virtue and is illegal." *ASCAP*, 441 U.S. 1, 16, 99 S.Ct. 1551, 1560, 60 L.Ed.2d 1; or

4. The practice is a naked restraint of trade with no purpose except stifling of competition"; and *White Motor Co. v. United States*, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); or

5. The challenged practice may have "redeeming competitive virtues and that the search for these virtues is almost sure to be in vain." *ASCAP*, 441 U.S. at 13, 99 S.Ct. at 1559.

■ This court, after finding no evidence in the record that the Charlottesville Split agreement and operation is undisputedly a naked restraint of trade with no purpose except the stifling of competition nor is as horrendous as the five previously carved out *per se* criteria noted above, concludes that the split which existed in Charlottesville from April 1975 to April 1977 was not unlawful under the Sherman Act because it did not constitute a *per se* violation of the Act.

To the extent raised in parties' briefs, and in oral argument before the court, in finding that the Charlottesville Split is not *per se* illegal, the court holds that the facts and circumstances of the instant case neither fall within any of the previously established categories of *per se* violations nor advance any facts and circumstances, which support the creation of a new category of *per se* violations.

Accordingly, the court must enter judgment in favor of plaintiff, Greenbrier Cinemas, Inc.

The court's disposition in this matter should not be interpreted as a pronouncement as to the ultimate legality or illegality of any particular split. Given the parties' stipulation which has governed the factual development and consideration of the case, and given the conclusions of law set down here, the court's decision can only stand for the proposition that an evaluation of the legality of the Charlottesville Split must be structured under the rule of reason. It follows that analysis of other splits can only be made on a case by case basis.