**UNITED STATES of America**

**v.**

**CINEMETTE CORPORATION OF AMERICA, George Stern, Larry Collins, Defendants.**

Crim. No. 87–232.

United States District Court,
W.D. Pennsylvania.

April 6, 1988.

R.J. Scott Griffith, Asst. U.S. Atty., Philadelphia, Pa., for U.S.

Joseph Giffin, Chicago, Ill., for Cinemette Corp. of America.

Steven Miller, Cleveland, Ohio, Dennis Lewis, Pittsburgh, Pa., for George Stern.

Anthony Mariani, Pittsburgh, Pa., for Larry Collins.

## MEMORANDUM OPINION

BLOCH, District Judge.

The indictment in this case charges the defendants with a violation of § 1 of the Sherman Act, 15 U.S.C. § 1. The charges arise out of an alleged conspiracy to eliminate competition in the operation of motion picture theatres in the Altoona, Pennsylvania area. Pending before the Court is defendants' motion to dismiss the indictment.

Defendants present several arguments in support of their motion. The first argument rests upon the due process clause of the Fifth Amendment; defendants contend that, as of the time of the charged offense, the decisional law interpreting § 1 of the Sherman Act did not provide fair warning that the conduct in question might expose the defendants to criminal liability. In addition, defendants claim that the government represented that it would not initiate criminal prosecutions concerning split agreements until civil cases in the area had established a framework for determining the legality of such conduct under § 1 of the Sherman Act. Related to these arguments is the defendants' contention that, due to the unresolved nature of the case law regarding the legality under § 1 of the Sherman Act of the type of agreement at issue, this prosecution constitutes an application of *ex post facto* law.

Defendants also argue that the indictment should be dismissed because it fails to properly charge specific intent as an element of the offense and that, in any event, as a matter of law, they could not have possessed the required intent. Finally, defendants claim that the government has impermissibly singled them out for prosecution while failing to prosecute others who allegedly have engaged in similar conduct. Therefore, they contend, the indictment must be dismissed.

### I. Factual Background

In ruling upon a motion to dismiss an indictment, the Court must accept the factual allegations set forth therein as true. *United States v. National Dairy Products Corporation,* 372 U.S. 29, 33 n. 2, 83 S.Ct. 594, 598 n. 2, 9 L.Ed.2d 561 (1963); *Boyce Motor Lines v. United States,* 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 332 n. 16, 96 L.Ed. 367 (1952).

The government alleges that during the period covered by the indictment distributors of motion pictures licensed those pictures on a picture-by-picture, theatre-by-theatre basis. Where two or more exhibitors operated theatres within a given local market, a distributor would license its films by competitive bidding or by negotiating with competing theatres. Under ordinary circumstances, the license would be awarded to the exhibitor making the best offer, after considering licensing terms offered by competing exhibitors, seating capacity, theatre location, and other factors.

The indictment alleges that from at least early January, 1985, until approximately August, 1986, the defendants and other co-conspirators entered into a "split agreement," the purpose of which was to eliminate competition among theatres in the Al-

toona, Pennsylvania area in connection with the acquisition of licenses to exhibit motion pictures.

The government describes a split agreement as an agreement among film exhibitors to allocate the films for which they otherwise would be competing and to refrain from competing for those films. Defendants contend that a split agreement is simply a non-binding allocation among film exhibitors of the first rights to negotiate with particular distributors for specific films.

The indictment charges that the defendants and their alleged co-conspirators refrained from submitting bids for motion picture licenses, submitted offers only for the exhibition of motion pictures at theatres to which the motion pictures previously had been allocated or "split" pursuant to the agreement, refrained from dealing with distributors with respect to motion pictures split to other participants in the conspiracy, and generally refrained from competing against each other for the licensing of motion pictures.

## II. The Merits of Defendants' Claims

### A. Due Process Concerns

#### 1. Vagueness

■ Defendants argue that at the time of the actions charged in the indictment, no court had held that split agreements amounted to criminal violations of the Sherman Act. Moreover, they argue, several courts had held that split agreements did not constitute even civil antitrust violations. In the absence of a definitive judicial interpretation holding such conduct illegal, defendants contend, this prosecution violates due process because the scope of application of the law was unclear.

The standard to be applied in determining whether a statute fails to provide adequate warning of possible criminal penalties is set forth in *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954), as follows:

> The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary

intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.

On its face, § 1 of the Sherman Act proscribes a broad range of conduct, making unlawful any contract, combination or conspiracy which restrains interstate or foreign trade or commerce. "With certain exceptions for conduct regarded as *per se* illegal because of its unquestionably anticompetitive effects, ... the behavior proscribed by the Act is often difficult to distinguish from the gray zone of socially acceptable and economically justifiable business conduct." *United States v. United States Gypsum Company*, 438 U.S. 422, 440–41, 98 S.Ct. 2864, 2875, 57 L.Ed.2d 854 (1978) (citation omitted).

A determination of the proper scope of application of § 1 and, accordingly, resolution of the defendants' vagueness challenge, requires reference to judicial interpretations of the Act's language. *National Society of Professional Engineers v. United States*, 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978). As the Court has noted, § 1 "cannot mean what it says.... [R]estraint is the very essence of every contract; read literally, § 1 would outlaw the entire body of private contract law.... [Congress] expected the courts to give shape to the statute's broad mandate." *Professional Engineers, supra*, 435 U.S. at 687–88, 98 S.Ct. at 1363.

Early in the history of Sherman Act litigation, it was established that only those contracts and agreements which "unreasonably" restrain trade are unlawful. *Standard Oil Company of New Jersey v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). It long has been recognized that "agreements or practices which, because of their pernicious effect on competition and lack of any redeeming virtue, are conclusively presumed to be unreasonable and therefore illegal, without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific R.R. Com-*

*pany v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). *See also Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980).

Price-fixing is one type of business practice which falls within the category of *per se* illegality since price-fixing agreements are patently anti-competitive and can serve no legitimate purpose other than restraint of competition. *United States v. Socony–Vacuum Oil Company,* 310 U.S. 150, 212–13, 60 S.Ct. 811, 839–40, 84 L.Ed. 1129 (1940) (citing *United States v. Trenton Potteries Company,* 273 U.S. 392, 397–98, 47 S.Ct. 377, 379–80, 71 L.Ed. 700 (1927)).

An agreement between competitors pursuant to which contract offers are to be submitted to or withheld from a third party constitutes bid rigging, *United States v. Portsmouth Paving Corporation,* 694 F.2d 312, 325 (4th Cir.1982), and bid rigging repeatedly has been held to be a *per se* violation of § 1 of the Sherman Act, as a type of price-fixing. *Portsmouth Paving, supra; United States v. Brighton Building and Maintenance Company,* 598 F.2d 1101, 1106 (7th Cir.1979); *United States v. Flom,* 558 F.2d 1179, 1183 (5th Cir.1977); *United States v. Bensinger Company,* 430 F.2d 584 (8th Cir.1970).

In *National Society of Professional Engineers, supra,* the Supreme Court examined an agreement among competing engineers to refuse to discuss prices with potential customers until negotiations had resulted in selection by the customer of a particular engineer's services. The Court noted that such an agreement, while not amounting to price-fixing as such, "operates as an absolute ban on competitive bidding" which "impedes the ordinary give and take of the market place" and "deprives the customer of the ability to utilize and compare prices" in determining whose services it would prefer to obtain. *Id.* 435 U.S. at 692–93, 98 S.Ct. at 1366. The Court concluded that the agreement "on its face

... restrain[ed] trade within the meaning of § 1 of the Sherman Act."

In light of the decision in *Professional Engineers, supra,* and the substantial case law holding that restrictions upon competitive bidding constitute price-fixing, a *per se* violation of the Sherman Act, the Court finds little merit in defendants' claims that they were not given fair notice that split agreements could constitute violations of § 1. Due process requires "no more than a reasonable degree of certainty" in the law. *Boyce Motor Lines, Inc., supra,* 342 U.S. at 340, 72 S.Ct. at 331. The aforementioned decisions, all of which appeared on the books prior to the period of time during which the alleged offense occurred, provided clear notice that agreements among competitors to submit collusive, non-competitive bids violate the law. The split agreement described in the instant indictment, if proven, would fall within this definition.[1]

### 2. History of Government Actions Against Split Agreements

Defendants claim that the government represented that it would pursue civil enforcement actions in an attempt to clarify the law with regard to split agreements prior to initiating criminal prosecutions, and that the instant prosecution was initiated despite the fact that the law remains unclear concerning the legality of such agreements. In order to address this argument, the history of the government's enforcement policies concerning the agreements must be reviewed.

On April 1, 1977, the Department of Justice issued a press release announcing that henceforth it would take the position that the use of split agreements by motion picture exhibitors violated the antitrust laws and that "continuation of this practice will subject participants to appropriate legal action by the Department's Antitrust Division." Split agreements had been widely used by motion picture exhibitors for dec-

---

1. In light of this holding, the Court finds it unnecessary at this time to address the government's claim that the conduct charged in the indictment, if proven, would constitute an unlawful horizontal market allocation. Market di-

vision likewise is a *per se* violation of § 1 of the Sherman Act. *United States v. Topco Associates,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

ades, particularly following the Supreme Court's decision in *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948). The press release served to notify the industry that the Justice Department considered split agreements to be "virtually indistinguishable from bid rigging practices, a traditional *per se* violation of § 1 of the Sherman Act."

In response to the press release of April 1, 1977, the National Association of Theatre Owners directed a letter to Assistant Attorney General Donald Baker, of the Antitrust Division of the Justice Department, concerning the change in policy. Baker responded in a letter, which read in pertinent part as follows:

> We entirely agree with you that the federal courts are the appropriate forum for determining the legality of "split" agreements. While we believe that such "split" agreements are *per se* illegal, we recognize that the Department has not taken this view in earlier years and has not brought any prior action. Accordingly, it is our present enforcement intention that the initial case or cases which we may bring against "split" agreements will be civil cases seeking equitable relief. However, if we discover a "split" agreement which involved clearly predatory or coercive conduct, we might well proceed criminally there because of the special nature of the conduct.

Thereafter, a motion picture exhibitor in the Charlottesville, Virginia area brought an action seeking a declaration that a split agreement in which it had participated did not violate the federal antitrust laws. *Greenbrier Cinemas, Inc. v. Attorney General*, 511 F.Supp. 1046 (W.D.Va.1981). The parties stipulated that there would be no evidence and no finding on the purpose or effect of the split, and that the issue at trial would be limited only to what the split agreement was and how it operated in Charlottesville. In the words of the district court, "the rationale behind the parties' stipulation was that all parties concerned wanted the court to decide the validity of the government's press release [of April 1, 1977]." *Id.* at 1059.

In its decision dated February 20, 1981, the district court held that the split which existed in Charlottesville was not *per se* unlawful under the Sherman Act. The Court, however, chose "only to decide the application of that press release to the *Greenbrier* case" and noted that the court's disposition of the case "should not be interpreted as a pronouncement as to the ultimate legality or illegality of any particular split." *Id.* at 1059–60.

The government's first civil enforcement case regarding split agreements was brought against exhibitors in the Milwaukee, Wisconsin area in May of 1980. *United States v. Capitol Service, Inc.*, 568 F.Supp. 134 (E.D.Wis.1983). In an opinion dated June 16, 1983, the district court held that the split agreement constituted price-fixing and division of markets, both of which constituted *per se* violations of the Sherman Act. The Milwaukee split was structured and operated in a manner very similar to the alleged split in the case at hand. On February 28, 1985, approximately one month after the alleged inception of the conspiracy in this case, the Seventh Circuit Court of Appeals affirmed the decision of the district court, relying heavily upon *Professional Engineers, supra. United States v. Capitol Service, Inc.*, 756 F.2d 502 (1985).

It is against this background that defendants' claims must be addressed. Defendants rely upon the decision of the Third Circuit in *Viking Theatre Corporation v. Paramount Film Distributing Corporation*, 320 F.2d 285 (1963), *aff'd. per curiam by an equally divided court*, 378 U.S. 123, 84 S.Ct. 1657, 12 L.Ed.2d 743 (1964), a case in which the sole issue presented was whether a split agreement which failed to include all competing exhibitors constituted a *per se* violation of § 1. The Court declined to hold that such an agreement was *per se* illegal "in the absence of evidence that it was so employed as to unreasonably restrict the competitive market or had this result." 320 F.2d at 293. The plaintiff in *Viking Theatre* did not produce evidence that the split either

had such an effect or was so intended and this failure of proof clearly formed the basis for the Third Circuit's holding. The precedential effect of the *Viking* decision, therefore, is significantly limited.

The facts of *Viking Theatre* are distinguishable from the instant case. The action was brought by an exhibitor who had been excluded from participation in the split; the film distributors themselves were alleged to have participated in the agreement. Thus, the issues of competitive injury and trade restraint were framed in a manner substantially different from circumstances in the instant case.[2] In short, contrary to defendants' contentions, *Viking Theatre* does not stand for the proposition that in this Circuit a split agreement, regardless of its factual circumstances, constitutes legitimate business conduct immune from liability or prosecution under the Sherman Act. Defendants cannot rely upon the decision in claiming that they reasonably believed that conduct such as that charged in the indictment was legal.

Defendants also rely upon *Admiral Theatre Corporation v. Douglas Theatre Company,* 585 F.2d 877 (8th Cir.1978), which involved a private antitrust action under § 1, brought by a film exhibitor against other exhibitors who were alleged to have entered into a split agreement. As in *Viking Theatre,* the Court's decision rests upon the failure of the plaintiff to produce evidence sufficient to support its claim. The Court declined to decide whether the split agreement at issue was illegal under any *per se* category, since the plaintiff had failed to sustain its burden of proof. The failure of the plaintiff in *Admiral Theatre* to marshal evidence in support of its legal theory, substantially undermines any legal import which might be assigned to the Eighth Circuit's decision. Moreover, the decision contains language which reasonably might be interpreted as

putting the defendants on notice regarding the legality of split agreements; in reaching its decision, the Court noted that "a reduction in competitive billing is 'illegal on its face' because it interferes with free market forces." *Id.* at 891.

Defendants also claim that the decision of the district court in *Greenbrier Cinemas,* discussed *supra,* supports their contention that split agreements do not amount to violations of § 1 of the Sherman Act. As noted earlier, however, due to the stipulations entered into by the parties in that case, the Court's review was limited to the single issue of the validity of the government's press release. The Court's own statement that its ruling should not be interpreted as a pronouncement as to the legality of split agreements in general, in this Court's view, precludes any argument by defendants that they were justifiably entitled to rely upon *Greenbrier* as establishing the validity of split agreements under the Sherman Act.

In summary, the Court rejects defendants' contention that the case law regarding split agreements remains vague and undefined that they had no reason to believe that conduct such as that charged in the indictment would expose them to criminal liability. In light of the decisions discussed in Part II(A)(1) of this opinion which clearly hold that price-fixing and, more specifically, restraints upon competitive bidding, constitute unlawful restraints of trade, little credence can be given to defendants' claim that there exists sufficient ambiguity in the applicable law to justify dismissal of an indictment on due process grounds. This is especially true where, as here, the factual bases of the cases upon which defendants rely vary substantially from the allegations contained in the indictment at hand.

---

**2.** For similar reasons, the defendants' reliance upon *Southway Theatres, Inc. v. Georgia Theatre Company,* 672 F.2d 485 (5th Cir.1982), is unjustified. The plaintiff in *Southway* was proceeding upon a boycott theory under §§ 1 and 2 of the Sherman Act, claiming that locally competing film exhibitors and national film distributors had entered into an agreement with the purpose of depriving plaintiff of the opportunity to license certain motion pictures and thereby eliminating plaintiff from competition in the licensing and exhibition of those films. The facts of the *Southway* case thus bear little resemblance to those of the instant case, as they are alleged in the indictment.

■ Defendants also have argued, in connection with their due process claim, that the government's failure to pursue a number of civil enforcement actions involving split agreements prior to initiating the instant prosecution was improper, given the representations made in the 1977 press release and Assistant Attorney General Baker's letter, quoted *supra.* In the context of this argument, the Court finds persuasive the reasoning of the district court in *United States v. Plitt Southern Theatres, Inc.,* 1987–2 Trade Cases p67, 681 (W.D.N.C.1987) [available on WESTLAW, 1987 WL 19346]. The decision of the government to provide advance notice to the film industry that it considered split agreements to be unlawful is fully consistent with principles of notice and due process. Moreover, in light of this Court's holding that the law was clear concerning the legal ramifications of price-fixing, prior to the period of time at issue in the indictment, defendants' argument must fail; it is apparent that the government could have initiated criminal prosecutions concerning split agreements without providing any advance notice.

Defendants further claim that the government has actively misled them into believing that they would not be prosecuted for the conduct as charged in the indictment. This argument is without merit. The law precludes the government from punishing a defendant for actions taken in good faith reliance upon assurances by the government that punishment would not follow. *United States v. Laub,* 385 U.S. 475, 87 S.Ct. 574, 17 L.Ed.2d 526 (1967); *Raley v. Ohio,* 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959). The defendants' allegations, however, do not support a claim that the government has misled the film industry by representing that split agreements were considered legal or that criminal liability would not attach. Particularly since the *Capitol Services'* decisions, *supra,* the film industry has been on notice that the government takes the contrary view.

■ Moreover, the government is under no obligation to pursue a history of civil enforcement proceedings in a particular industry in advance of bringing criminal prosecutions for anti-competitive conduct. "[T]he Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike." *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 349, 102 S.Ct. 2466, 2476, 73 L.Ed.2d 48 (1982).[3]

### B. Lack of Requisite Intent

The parties agree that *United States v. United States Gypsum Company, supra,* is the leading case on the issue of intent with regard to offenses under § 1 of the Sherman Act. *Gypsum* holds that "a defendant's state of mind is an element of a criminal antitrust offense." *Id.* 438 U.S. at 435, 98 S.Ct. at 2872. In a conspiracy case such as the instant one, two different types of intent generally are required: "the basic intent to agree, which is necessary to establish the existence of the conspiracy, and the more traditional intent to effectuate the object of the conspiracy." *Id.* 438 U.S. at 443 n. 20, 98 S.Ct. at 2877 n. 20.

■ Defendants contend that the indictment fails to properly allege intent as an element, in that it makes no specific reference to defendants' state of mind at the time of the commission of the charged offense. No such language is necessary, however. "Intent to accomplish an object cannot be alleged more clearly than by stating that the parties conspired to accomplish it." *Frohwerk v. United States,* 249 U.S. 204, 209, 39 S.Ct. 249, 251, 63 L.Ed. 561 (1919). *See also Burroughs v. United States,* 290 U.S. 534, 544, 54 S.Ct. 287, 289, 78 L.Ed. 484 (1934). The indictment alleges the defendants entered into a conspiracy to eliminate competition for film licenses being offered by distributors for theatres in the Altoona area. Nothing more is required.

■ Defendants also argue that due to the claimed uncertain legal status of split

---

3. In light of the foregoing holdings, the Court finds it unnecessary to address defendants' claim that the instant indictment amounts to an *ex post facto* application of law.

agreements, as a matter of law, they could not have formed the requisite intent to support a criminal conviction under § 1. This contention, however, rests upon the inaccurate assumption that the required intent is an intent to violate a specific criminal statute. A finding of criminal intent in a prosecution under § 1 may be established, however, by proof of a defendant's knowledge of the anticipated consequences of his conduct. *United States Gypsum, supra,* 438 U.S. at 446, 98 S.Ct. at 2878. Whether or not the defendants in this case possessed such intent will be a question for the jury.

## C. Selective Prosecution

 Defendants claim that the indictment must be dismissed because the government impermissibly has singled them out for prosecution from a group of persons and entities alleged to have engaged in conduct the same as or similar to that which forms the factual basis for this prosecution. In order to make out their claim, the defendants must show that an element of intentional or purposeful discrimination figured in the decision to prosecute them. Unequal application of the criminal laws alone does not amount to a constitutional violation. *United States v. Torquato,* 602 F.2d 564, 568 (3d Cir.1979).

Intentional and purposeful discrimination requires a showing, on the part of the defendant, that "while others similarly situated have not been prosecuted because of conduct of the type forming the basis of the charge against the defendant, [the defendant] nevertheless has been singled out for prosecution and, that the government's discriminatory selection of him for prosecution has been invidious or in bad faith." *Id.* at 569 n. 8.

The burden of establishing an impermissible purpose on the part of the government rests with the defendant. *United States v. Malinowski,* 472 F.2d 850, 860 (3d Cir.1973). Defendants have failed to allege that the government's decision to prosecute them was based upon such impermissible considerations. "The choice of when to prosecute and the strategy of prosecution are generally matters left wholly to the government's control." *Torquato, supra,* at 569.

An appropriate Order will be issued.

## ORDER

AND NOW, this 6th day of April, 1988, upon consideration of Defendants' Motion to Dismiss the Indictment filed in the above captioned matter on February 11, 1988,

IT IS HEREBY ORDERED that said Motion is DENIED.